IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MORT FERTEL                         :
                                    :
                                    :
         v.                         :    Civil No. CCB-13-2922
                                    :
                                    :
JAN DAVIDSON                        :
                                    :
                                    :

## MEMORANDUM

Plaintiff Mort Fertel ("Fertel") brings this defamation lawsuit against defendant Jan Davidson ("Davidson"), claiming that her statements posted on the Internet have caused harm to his reputation and business and resulted in mental anguish and humiliation. Davidson now moves to dismiss for lack of personal jurisdiction. The issues in this case have been fully briefed, and no hearing is necessary. *See* Local R. 105.6. For the reasons stated below, the motion to dismiss will be granted.

## BACKGROUND

Davidson, a resident of California since 1975, is a fifty-six-year-old mother of two children and an artist by profession. (*See* Aff. of Davidson, ECF No. 6-2, at ¶ 2.) She works from her home in California. (*Id.*) Fertel is the owner of MarriageMax Inc. ("MarriageMax"), a Maryland corporation that offers a step-by-step system for addressing marital problems. (Def.'s Mot. to Dismiss, ECF No. 6-1, at 2; *see also* Print-out of www.marriagemax.com, ECF No. 6-3, at 1.)

The "Marriage Fitness Tele-Boot Camp" program is the most popular MarriageMax program and includes seven "[t]ele-[s]eminars" hosted by Fertel as well as a private "1-on-1"

1

phone session with him.  (Print-out of www.marriagemax.com/marriage-help-products-services.asp, ECF No. 6-4, at 1.)  It also offers a "100% Money-Back Guarantee."  (Print-out of http://www.marriagemax.com/marriage-tele-boot-camp.asp, ECF No. 6-5, at 9.)  The return policy provides that, if the consumer is not satisfied "for any reason," she may return the program, so long as it is in "resalable condition," it is returned within thirty days of ordering, and the consumer has had her "private 1-on-1 session [with Fertel]."  (*Id.*)

Struggling in her marriage, Davidson sought marriage counseling programs and found MarriageMax through a Google search conducted from her California home.  (Aff. of Davidson at ¶ 3.)  On May 28, 2013, she purchased the Tele-Boot Camp program through the MarriageMax website, and the program arrived a few days later.  (Def.'s Mot. to Dismiss at 3; *see also* Aff. of Davidson at ¶¶ 3–4.)  Despite being "put off" by Fertel's voice, Davidson and her husband attempted the program for the next three weeks.  (Aff. of Davidson at ¶ 4.)  Because "[t]he program instructs customers to get as far into the program as possible" before scheduling the private phone session with Fertel, Davidson did not schedule the session during those three weeks.  (*Id.*)  Finally, Davidson and her husband decided not to continue the program.  (*Id.* at ¶ 5.)

On June 20, 2013, during regular business hours, Davidson called MarriageMax customer service to gather information about returning the product for a refund.  (*Id.*)  When no one answered the phone, she left a voicemail.  (*Id.*)  Davidson called again the next day when she did not hear back from MarriageMax, but she was still unable to reach anyone.  (*Id.*)  On June 25, 2013, she spoke with a customer service representative, who provided her with a link to MarriageMax's return policy.  (*Id.* at ¶ 6.)  Davidson then realized that she needed to schedule the phone session with Fertel and, accordingly, she emailed customer service to inquire about

how to schedule the session. (*Id.*) On June 26, 2013, customer service emailed Davidson an online link to make the appointment with Fertel. (*Id.* at ¶ 7.) Davidson visited the link that day, and learned that the next available date for a session with Fertel was July 29, 2013. (*Id.*) Because this date was over a month away, she called and emailed customer service to ask for an extension of the return policy. (*Id.*) Customer service informed Davidson that she could not get a refund without the session with Fertel, and that only Fertel's assistants had authority to grant an exception to the return policy. (*Id.*) On July 27, 2013, Fertel's assistant verified that Davidson was not eligible for a refund, writing in an email that she had not met the requirements for returning the program. (*Id.* at ¶ 8.) Davidson again called and emailed customer service, but was unsuccessful in getting an exception to MarriageMax's return policy. (*Id.* at ¶ 9.) She attempted to mail the program to MarriageMax on July 8, 2013, but, a few weeks later, MarriageMax sent the program back to Davidson without providing a refund. (*Id.*)

Following her communications with MarriageMax, Davidson wrote about her experiences on the websites TrustPilot and Ripoffreport.com, which have a national and global audience, respectively. (*See id.* at ¶ 10.) On July 21, 2013, Davidson posted a review of MarriageMax—entitled "Company's Requirements for 100% Money Back Guarantee were Impossible to Meet!"—on TrustPilot. (Def.'s Mot. to Dismiss at 5; *see also* Aff. of Davidson at ¶ 10.) The same day, she wrote a similar review on Ripoffreport.com, that one entitled "Mort Fertel Marriage Fitness, Marriage Max, Mort Fertel.com FRADULENT [sic] MONEYBACK GUARANTEE – DON'T BE FOOLED!" (Def.'s Mot. to Dismiss at 6; *see also* Aff. of Davidson at ¶ 10.) The header section of the post included MarriageMax's Maryland address and also listed the location of MarriageMax as "Baltimore MA." (Def.'s Mot. to Dismiss at 7.)[1]

---

[1] Davidson admits this was a typographical error. (Def.'s Mot. to Dismiss at 7.)

Davidson also posted on Ripoffreport.com on July 21, 2013; the post was entitled "REFUND TERMS ARE NEARLY IMPOSSIBLE TO MEET." (*Id.*) On August 7, 2013, Davidson wrote another review on Ripoffreport.com, "Mortel Fertel Marriage Max Deceptive Return Policy – Terms are Impossible to Meet – Don't Buy Unless You Can Afford Ton [sic] Lose $400." (*Id.* at 8.) In the heading of the post, the location of MarriageMax was listed as "Baltimore Maryland." (*Id.*)[2]

According to Fertel, Ripoffreport.com allows a listing of "Internet" for the location of a business. Thus, Davidson did not need to name the state where MarriageMax is located. (*See* Pl.'s Resp., ECF No. 7, at 2; *see also* Print-out of www.ripoffreport.com/FileReport.aspx, ECF No. 12.) Ripoffreport.com allows visitors of the website to conduct searches by city, state, zip code, or company name. (Pl.'s Resp. at 8.) Because MarriageMax's location was listed as Baltimore, Maryland, searches by "Baltimore" or "Maryland" presumably would include Davidson's reviews of MarriageMax. (*See id.*)

## STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a challenge to personal jurisdiction "is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). When the court resolves a motion to dismiss based on lack of jurisdiction without an evidentiary hearing, however, "the plaintiff need only

---

[2] Fertel states that Davidson "recounts that on each of her defamatory postings, she deliberately listed the location of Plaintiff's business as Maryland (but for one post in which she made a typographical error and wrote Baltimore, MA)." (Pl.'s Resp., ECF No. 7, at 2.) Davidson's account of her posts, however, suggests that only two of them referenced Maryland. It therefore appears that Fertel has misread Davidson's papers. Nevertheless, even assuming that all the posts listed MarriageMax's location as in Baltimore, Maryland, the below analysis remains unchanged.

4

make a prima facie showing of personal jurisdiction." *Id.* (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "[T]he court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993) (quoting *Combs*, 886 F.2d at 676).[3]

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant "if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993). Maryland's long-arm statute is coextensive with the scope of jurisdiction permitted by the Due Process Clause of the Fourteenth Amendment; therefore, the statutory and constitutional inquiries merge. *See Carefirst*, 334 F.3d at 396–97.[4] A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contacts" with the forum, such that requiring the defendant to defend her interests in that state "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). "The minimum contacts test requires the plaintiff to show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arise[s] out of' those

---

[3] In ruling on a Rule 12(b)(2) motion, the court may also consider evidence outside the pleadings. *Structural Preservation Sys., LLC v. Andrews*, 931 F. Supp. 2d 667, 671 (D. Md. 2013) (citations omitted); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) (suggesting that the court may consider evidence outside the pleadings when determining its jurisdiction).

[4] Although the statutory and constitutional inquiries merge, the court still must consider whether the defendant's activities are covered by the long-arm statute. *See Dring v. Sullivan*, 423 F. Supp. 2d 540, 545 (D. Md. 2006). Here, Fertel does not identify the relevant Maryland statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103, but rather relies on the "effects" test set forth in *Calder v. Jones*, 465 U.S. 783 (1984).

activities." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

The Fourth Circuit has outlined a three-pronged test for determining whether the exercise of specific jurisdiction comports with due process.[5] Under this test, courts must consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst*, 334 F.3d at 397.

## ANALYSIS

Fertel argues that Davidson's posts to TrustPilot and Ripoffreport.com constitute defamatory statements "willfully target[ed] . . . at a Maryland business . . . with the specific intent to harm that business," such that they give rise to specific jurisdiction. The court may put aside Davidson's other few contacts with Maryland—namely, her act of purchasing the Tele-Boot Camp program from a Maryland company, her various phone and email communications with MarriageMax employees, and her attempt to send the program back to MarriageMax—because Fertel does not rely on them in arguing personal jurisdiction. (*See, e.g.*, Pl.'s Resp. at 7 (stating that Davidson's contacts with Maryland were her online posts listing Maryland as MarriageMax's location).)

---

[5] In cases where the defendant's contacts with the forum state are the basis for the lawsuit, those contacts may establish specific jurisdiction. *See ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002). By contrast, if the defendant's contacts are not the basis for the lawsuit, then the defendant's continuous and systematic, but unrelated, contacts with the forum state may establish general jurisdiction. *See id.* Fertel concedes that Davidson is not subject to general jurisdiction in Maryland. Accordingly, the court need only address whether Davidson is subject to specific jurisdiction.

As a preliminary matter, the court notes that whether exercising personal jurisdiction over a nonresident defendant comports with due process is a federal question. *See Catalana v. Carnival Cruise Lines, Inc.*, 618 F. Supp. 18, 20 (D. Md. 1984), *aff'd*, 806 F.2d 257 (4th Cir. 1986) (unpublished opinion); *see also Carefirst*, 334 F.3d at 397–98 (applying federal law to determine whether the exercise of personal jurisdiction satisfies due process). Fertel criticizes Davidson for not citing *MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md. App. 481, 890 A.2d 818 (2006), but *MaryCLE* is a state court opinion and not analogous to the present case. Indeed, Fertel does not explain how *MaryCLE* is similar to this case, other than the observation that both cases involve the Internet. (*See* Pl.'s Resp. at 3–4.) *MaryCLE* involved an out-of-state marketing company that sent email messages directly to Maryland residents, unlike Davidson's web postings. *See* 166 Md. App. at 489–92, 890 A.2d at 823–24. The court in *MaryCLE* decided that sending email messages to Maryland residents amounted to "purposeful[] avail[ment] . . . of the privilege of conducting business in Maryland"—a basis for personal jurisdiction that is not alleged in the present case. *See id.* at 505, 890 A.2d at 832 (internal quotation marks omitted). *MaryCLE*, in short, does not control the court's determination of whether Davidson's Internet posts may lead to personal jurisdiction in Maryland.

Turning to the standard for whether Internet activity may lead to personal jurisdiction over an out-of-state defendant, the Fourth Circuit has explained that the mere act "of placing information on the Internet is not sufficient by itself to subject[] that person to personal jurisdiction in each State in which the information is accessed." *Carefirst*, 334 F.3d at 399 (citation and internal quotation marks omitted). Rather, the court may exercise personal jurisdiction over an out-of-state individual when she "(1) directs electronic activity into the [forum] State, (2) with the manifested intent of engaging in business or other interactions within

the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002).

Interpreting prongs (1) and (2) of the above test, the Fourth Circuit in *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002), considered whether there is personal jurisdiction over Connecticut defendants based on the following: "(1) the [defendants], knowing that [the plaintiff, the warden of a Virginia prison,] was a Virginia resident, intentionally discussed and defamed him in their [newspaper] articles, (2) the newspapers posted the articles on their websites, which were accessible in Virginia, and (3) the primary effects of the defamatory statements on [the plaintiff's] reputation were felt in Virginia." *Id.* at 261–62. The court reasoned that, to be subject to personal jurisdiction in Virginia, the out-of-state defendants had to "through the Internet postings, manifest an intent to target and focus on Virginia readers." *Id.* at 263. In determining whether there was such a focus on Virginia readers, the court examined the "general thrust and content" of the newspapers' websites as well as the specific articles at issue. *Id.* The court concluded that the newspapers' websites were designed to serve local interests, including "provid[ing] their local markets with a place for classified ads." *Id.* Likewise, although the newspaper articles named the plaintiff and discussed the "allegedly harsh conditions at the [Virginia] prison," they were not targeted at a Virginia audience. *Id.* at 263–64. Rather, the court concluded, the newspaper articles targeted a Connecticut audience because they focused on the Connecticut prisoner transfer policy that brought Connecticut prisoners to Virginia prisons. *Id.* at 259, 263–64.

Applying *Young*, there is nothing in Davidson's Internet posts to suggest that they were meant for a Maryland audience, as opposed to a national or even a global audience, and thus, her

8

conduct fails prongs (1) and (2). To begin, the TrustPilot and Ripoffreport.com posts are available not just in Maryland, but nationally and globally, respectively. That they may be accessed in Maryland is not enough for personal jurisdiction. *See Carefirst*, 334 F.3d at 399. Furthermore, the subject matter of Davidson's posts was not focused on Maryland; rather, the only mention of Maryland came from including MarriageMax's address and listing the location of MarriageMax as Baltimore, Maryland. But simply listing MarriageMax's address and referring to Baltimore, Maryland as the location of MarriageMax is not equivalent to targeting a Maryland audience. Although MarriageMax is based out of Maryland, it does not sell products only to individuals in Maryland; indeed, the MarriageMax website indicates that the Tele-Boot Camp program has been featured in various television broadcasts and national publications, suggesting that the company has a national customer base. (*See* Print-out of http://www.marriagemax.com/marriage-tele-boot-camp.asp at 1.) While Davidson's posts indicate a desire to share information with potential MarriageMax customers, it is pure speculation that she was attempting to direct this information to potential MarriageMax customers located in Maryland. If anything, Davidson's apparent frustration with MarriageMax's return policy suggests a desire to communicate with as many potential customers as possible, and not just the company's potential customer base in Maryland. Because Davidson's posts were not directed at Maryland, they cannot form the basis for personal jurisdiction.

Fertel appears to argue that, because visitors to Ripoffreport.com may conduct searches by city or state and find Davidson's posts, Davidson intended to target a Maryland audience. This argument cannot stand. Examining the "File a Report" page of Ripoffreport.com—which is where Fertel suggests that Davidson listed MarriageMax's location, (*see* Pl.'s Resp. at 2)—it

seems that the page is meant to identify the company or individual being reported. (*See* Print-out of www.ripoffreport.com/FileReport.aspx.) The page requests the name of the company or individual being reported, along with the address (either the physical street address or web address) for the company or individual. (*See id.*) It does not give any indication that, by entering this information, the consumer's subsequent posts will be limited to a particular geographical audience or will be in any way highlighted for certain visitors of the website. In fact, as indicated above, reports on Ripoffreport.com are available globally. Based on these facts, the court cannot infer that, by entering MarriageMax's name and location, Davidson had the manifest intent to reach a Maryland audience. Rather, by entering this information, Davidson likely intended to identify the company against which she had a grievance.

Finally, Fertel attempts to liken this case to *Calder v. Jones*, 465 U.S. 783 (1984), by arguing that Davidson knew he was located in Maryland and, therefore, she was aware that any harm would be felt in Maryland. But *Calder* did not just involve out-of-state defendants who were aware that harm might be felt in the forum state of California. Rather, the defendants engaged in "intentional, and allegedly tortious, actions . . . *expressly aimed* at California," and as a result, they could foresee harm being felt in that state. *See* 465 U.S. at 789–90 (emphasis added). In particular, the defendants in *Calder* published an article regarding "the California activities of a California resident," that was "drawn from California sources" and "impugned the professionalism of an entertainer whose television career was centered in California." *Id.* at 788–89. Perhaps most notable, the article was published in a national weekly newspaper that drew a large portion of its readership from California; of its total circulation of over 5 million, "[a]bout 600,000 of those copies, almost twice the level of the next highest State [we]re sold in California." *Id.* at 785. As explained above, missing in the present case is conduct *expressly*

*aimed* at Maryland. Davidson's posts instead would appeal to a national, or even global, audience. Unlike in *Calder*, there is nothing to suggest that TrustPilot and Ripoffreport.com draw a significant portion of their readership from Maryland. Moreover, whereas *Calder* involved multiple connections to the forum state of California, the only Maryland connections in this case are that (1) Fertel and MarriageMax happen to be located there and (2) Davidson identifies this fact in her Internet posts. Thus, in light of the fact that her posts were not aimed at a Maryland audience, it is not enough to say that Davidson could foresee harm to Fertel in Maryland. Davidson did not expressly aim her electronic activity at Maryland.

## CONCLUSION

For the reasons stated above, the court will grant Davidson's motion to dismiss for lack of personal jurisdiction. A separate order follows.

December 18, 2013  
Date

/s/  
Catherine C. Blake  
United States District Judge